UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| JAMES R. CHEEK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 2:05-CV-169 PPS |
| ) | |
| LAZZARO COMPANIES, INC. d/b/a ) | |
| LAZZARO GLASS, and GEORGE PUTZ, ) | |
| individually and in his corporate capacity, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff James R. Cheek was employed at Lazzaro Companies, Inc. ("Lazzaro") as a custodian until he was terminated on April 21, 2004. Just prior to being fired, Cheek refused to accept a substantial pay cut that was being demanded by Lazzaro. According to Cheek, he was told by his boss that the pay cut was necessary so that Lazzaro could pay the "younger guys" more money. After he balked at the decrease, he was fired. A few days later, two substantially younger employees were, in fact, given a raise. Unsurprisingly, Cheek claims that he was the victim of age discrimination and he commenced this action under the Age Discrimination in Employment Act (the "ADEA"). In addition, Cheek alleges wrongful discharge and intentional infliction of emotional distress under Indiana state law.

This matter is before the Court on Lazzaro's Motion for Summary Judgment. [Doc. 21]. Because this Court finds there are substantial questions of material fact surrounding the circumstances of Cheek's termination, we **DENY** summary judgment as to Cheek's ADEA and wrongful discharge claims. However, because Cheek has failed to show any outrageous conduct

or intent on the part of Lazzaro, summary judgment is **GRANTED** with respect to his intentional infliction of emotional distress claim.

## FACTUAL BACKGROUND

**A. Employment History**

Cheek began his employment as a custodian at Lazzaro in January 1995. Lazzaro is an Indiana corporation that provides construction services for the installation of glass and hollow metal doors. At the time Cheek began his employment, he was 57 years old and had previously worked for 34 years at a refractory. At the time of his termination, Cheek was 66 years old.

Cheek performed a number of different job duties during his nine years at Lazzaro. Over the years, the hodgepodge of duties included: ordering janitorial supplies and supervising outside janitorial vendors, checking materials in and out from UPS, keying locks, performing general maintenance of Lazzaro's facility, running errands and making local deliveries, inspecting Lazzaro's vehicles and scheduling maintenance and repairs, arriving early to open up the facility, assisting in tagging orders, loading and unloading trucks, and assisting the hardware manager. At the time of his termination, Cheek's job duties consisted primarily of custodial supervision including ordering supplies as well as checking in UPS packages. It also appears that until March 2004, Cheek made short deliveries using Lazzaro's pick-up trucks and he also arrived early to open the facility.

Lazzaro employed 11 other employees who worked with Cheek.[1] Seven of these individuals were fabricators. Although we do not know the precise duties of a fabricator, Cheek

---

[1]Approximately 31 employees worked at Lazzaro's facility, but apparently only 11 held jobs in the same area as Cheek. The remaining 20 employees are not discussed in either party's briefing.

admitted at his deposition that he could not perform those duties. (Cheek Dep. at 125). The other four employees were: 1) Timothy Tessier, a truck driver; 2) William Watson, a truck driver, delivery man, and maintenance man; 3) James Blakely, a part-time janitorial employee; and 4) John Perez, an apparent jack-of-all-trades who tagged orders, sorted doors, and loaded and unloaded trucks.

**B. Lazzaro's Financial Difficulties and Cost Cutting Measures**

According to Lazzaro, the company suffered significant financial losses during 2003 and 2004 such that in 2003 Lazzaro had a net operating loss of $105,435.00 and lost an additional net $84,367.32 in January of 2004 alone. Lazzaro arrived at these figures by calculating net profit and loss based on completed jobs and jobs in progress. Lazzaro used this method to calculate net profit and loss because it is the same analysis used by its banks and bonding companies to determine whether to make extensions of credit or offer bonds. As a result of these operating losses, Lazzaro's ability to bond jobs was in jeopardy. Therefore, Lazzaro undertook a number of cost-reducing measures including:

1. reducing the hours worked by fabricators and other employees;
2. eliminating overtime;
3. renegotiating lease payments for its building;
4. eliminating fees paid to company directors;
5. reducing the salary paid to each of the officers of the corporation; and
6. giving no raises during the first quarter of 2004.

3

**C.  Cheek's Termination**

Cheek was also affected by Lazzaro's so-called cost-cutting measures.  On March 5, 2004, George Putz, Lazzaro's president, informed Cheek that his work day would be reduced to six hour per day.  At that time, his wage was $15.00 per hour and, for the time being, would remain at that level.  On the same date that Cheek's hours were cut, Lazzaro also terminated James Blakely's employment.  Blakely was 64 at the time of his firing.

Thereafter, on March 7, 2004, Cheek wrote a letter to Putz in which he referenced his belief that his hours were reduced and some of his duties transferred to other employees because of his age.  He wrote:

> I have tried to tell you over the past few moths, that I am not ready to work part time, nor am I ready to retire.  I am not a retiring person.  I like my job.
>
> * * *
>
> As I told you before, I am not ready to become a part time worker. If you were not working the rest of the shop forty hours, I would be glad to settle for thirty.  That is not the case.

(Plf. Ex. 12).

Putz clearly understood Cheek's letter to be making an age discrimination accusation. During a meeting on March 9, 2004 between Putz and Cheek, Putz told Cheek that the hours reduction had nothing to do with Cheek's age and told him "let's not go to age discrimination insults."  (Plf. Ex. 13).  Apparently, during this meeting, there was also some discussion that came out of the blue regarding whether and why Cheek needed a note from his doctor to ensure that Cheek was fit to drive Lazzaro company vehicles.  (*Id.*).

Just a little over a month after the meeting, on April 20, 2004, Putz informed Cheek that

4

Lazzaro was reducing Cheek's hourly rate to $10.00 per hour – a 33% reduction in his pay. According to Lazzaro, the pay cut occurred because many of Cheek's non-janitorial duties were transferred to other employees which allowed Cheek to work fewer hours.  However, Cheek tells a very different story.  According to Cheek, he had a protracted discussion with Putz about the wage and hour decrease.  During the discussion, Cheek claims that he told Putz that he did not want to work for less than what he was making at the time.  Cheek claims that Putz responded that he needed Cheek to consent to the decreases so that "he could give the younger guys a raise."  (Cheek Dep. at 109).  Specifically, Putz referenced John Perez and Bill Watson as the "younger guys" who needed raises (*Id*. at 110).  Putz also told Cheek that there was nothing wrong with Cheek's job performance, but that he wanted Cheek to work for less so the "younger guys" could get paid more.  Ultimately, Cheek consented and told Putz that he would take the pay cut if necessary.

The next day, however, Cheek had a change of heart and told Putz that he would only agree to the wage decrease if his hours were increased back to 40 hours per week.  Putz claimed that he again tried to explain to Cheek that the wage and hour reductions were cost-cutting measures and that they had nothing to do with Cheek's age.  Putz also informed Cheek that if Cheek did not agree to Lazzaro's terms – $10.00 per hour, six hours per day – Cheek's position would be eliminated by the company.  Cheek did not agree with the terms and Putz asked Cheek to turn over his keys and terminated Cheek's employment.

Remarkably, Putz does not dispute that he told Cheek that part of the reason for Cheek's pay cut was so that Perez and Watson – the so called "younger guys" – could receive a raise. Indeed, in a letter dated April 20, 2004, Putz stated that "I explained that I had to do something

5

with John Perez and Bill Watson but our company cannot spend any more per hour for all employees than we are now spending." (Plf. Ex. 8). Putz denied that Lazzaro's decision to cut Cheek's hours and wages had anything to do with Cheek's age. Instead, Putz explained that the purpose for the pay and hours cut was part of a plan to phase out Cheek's job and give his duties to other employees as a cost-cutting measure.

**D.  John Perez and Bill Watson**

On April 22, 2004, the day after Cheek was terminated, Lazzaro changed John Perez's work hours and wages. Following through on what Cheek was told, Lazzaro increased Perez's work-day to ten hours per day and increased his pay from $10.50 per hour to $14.00 per hour. We do not know the net cost increase to Lazzaro from these changes because neither party submitted Perez's previous work hours. However, Putz testified at his deposition that Perez's work day was longer after the April 22, 2004 changes. (Putz Dep. at 73).

John Perez was 37 years of age at the time of Cheek's termination. Perez's job duties included: loading and unloading boxes, driving a fork truck, and performing additional tasks as required. After April 22, 2004, Perez took on additional duties including coming in early to open the warehouse, checking in UPS packages and working until 4:30 to close up the warehouse. At least some of these duties were previously performed by Cheek.

Further, on May 6, 2004, Bill Watson also received a $2.00 per hour pay raise for a total increase from $8.00 per hour to $10.00 per hour. We do not know whether Watson's hours were also increased. Watson was 21 years old when he was hired on March 22, 2004. Although Putz testified that Watson was hired as second full-time delivery driver, it appears that his job is more accurately described as an "odd-jobs" type position. Watson's job duties included making

6

deliveries, loading and unloading trucks, performing maintenance in the warehouse area such as sweeping the floors, and putting stock away after directed by Perez.  Regardless of Watson's exact job description, it is clear that he performed more duties than driving a delivery truck.  Here, too, at least some of Watson's job duties were previously performed by Cheek.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.  The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law.  *Anderson v. Liberty Lobby*, 447 U.S. 242, 252 (1986).  A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  In making this decision, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).

### A.  Age Discrimination Claim

The ADEA precludes employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . ." 29 U.S.C. § 623(a)(1).  In an ADEA case, an employee can defeat

summary judgment by presenting direct evidence of discrimination.  *Olson v. Northern FS Inc.*, 387 F.3d 632, 635 (7th Cir. 2004);  *Gusewelle v. City*, 374 F.3d 569, 574 (7th Cir. 2004); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003).

  Lazzaro implies that the only way that a plaintiff can make out a direct case of discrimination is by pointing to a discriminatory statement made by the decision-maker at the time of the adverse action.  But as the cases cited above demonstrate, while this is one way to establish direct discrimination, there are plainly others as well.  Under the direct method of proof, a plaintiff can also prevail by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Troupe v. May Dep't Store Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).  In *Troupe,* the Court identified three types of circumstantial evidence that could lead to a convincing mosaic of intentional discrimination: (1) suspicious timing, ambiguous statements, and behavior toward or comments directed at other employees in the protected group;  (2) evidence that employees similarly situated to the plaintiff but outside the protected class received systematically better treatment;  or (3) evidence that the plaintiff was qualified for a job in question, but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.  *Troupe*, 20 F.3d at 736.   Each type of circumstantial evidence can be used on its own or in conjunction with the other types of circumstantial evidence to establish discrimination.  *Id.*; *see also Gorence v. Food Center, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

  In this case, Lazzaro argues that Cheek has not presented any direct evidence of age

discrimination because he has presented no evidence of a direct statement from Lazzaro to Cheek that he was being terminated from his employment because of his age. (Def. Brief at 8). But this argument ignores the other type of proof under the direct method, the so-called "convincing mosaic." Lazzaro relies on *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343 (7th Cir. 1997) but its reading of *Plair* is far too narrow. In *Plair*, the Seventh Circuit briefly considered whether the plaintiff provided direct evidence of racial discrimination. In concluding that he did not, the court emphasized that:

> Plair does not contend that [his employer] ever said he discharged Plair because he is black. *Nor is there any claim that [the supervisor] ever referred to blacks in racially derogatory terms. Plair admits that no manager or supervisor at Brach said anything to him that was "racially insulting, hostile, or derogatory," during his termination or ever.*

*Id*. at 347 (emphasis added). Thus, it is clear that the Court focused not only on direct statements from the employer to the plaintiff about his termination, but also looked for evidence of general racial animus which may have created circumstances suggesting a racially motivated firing. *See also*, *Wichmann*, 180 F.3d 791, 800-801 (7th Cir. 1999) (finding that a derogatory comment regarding older workers made within a month of an ADEA plaintiff's firing could constitute direct evidence of age discrimination even though the employer did not specifically state that the plaintiff was fired because of his age).

As the Seventh Circuit has noted, a persistent problem in employment discrimination cases is the rigid adherence to the variety of "tests" and "factors" that have been established by the Supreme Court and the Courts of Appeal. *Olson*, 387 F.3d at 635. As the above discussion demonstrates, some of the questions that usually arise in these cases is whether there is direct evidence of discrimination under the direct method of proof. If there is not, then the court must

9

explore the oxymoron of whether there is circumstantial evidence (the "convincing mosaic") to prove the direct method.  Then, of course, there is the ubiquitous indirect burden shifting method and its multi-factor approach made famous in the *McDonnel Douglas* case.  What can get lost in the mechanics of all this is the simple question of whether the prohibited factor – in this case, age – motivated in part the employment decision.  Here, there is a material issue of fact whether it did.

      As a district court, we, of course, must follow the framework set by our superiors.  In so doing, we find that under the direct method of proof, Cheek has constructed a convincing mosaic of circumstantial evidence to survive summary judgment.  Cheek testified that Putz specifically told him that Cheek needed to accept lower raises so that the "younger guys" could receive wage increases.  Indeed, Putz himself stated in a letter that he "had to do something with John Perez and Bill Watson" – the "younger guys" – but that he could not spend any more per hour for all employees than he was currently spending.  When Cheek refused to sacrifice his earnings to provide wage increases to the younger guys, Lazzaro fired him.  The statements made to Cheek by Putz certainly create an inference that Lazzaro intended to lower the wages of the older employee in order to raise the wages of younger employees performing many of the same duties. Putz's own letter confirms this.

      Then, after Cheek's termination, Putz did, in fact, increase the salaries of both Perez and Watkins and increased the length of Perez's workday. This occurred in spite of Putz's general claims that all workers were subject to reduced work hours and that salaries were cut in order to decrease Lazzaro's operating losses.  Cheek was clearly meeting his employer's expectations; he was doing a good job.   Thus, there is evidence that Cheek was qualified for the job in

10

question but was replaced by a person not having the forbidden characteristic (age) and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. *Troupe*, 20 F.3d at 736.

Other evidence that makes up the convincing mosaic is that Putz made certain inquiries into Cheek's fitness to perform his job which may have been motivated by Putz's advancing age. In addition, on March 5, 2004, just prior to Cheek being fired, Lazzaro also fired James Blakely as part of the cost cutting measures. This is odd given the fact that Lazzaro hired Bill Watson just 17 days later. Blakely was 64; Watson was 21.

These facts, taken together, leave the Court with significant questions of material fact which preclude summary judgment on Cheek's age discrimination claim. These questions include, but are not limited to:

1. What, exactly, did Putz mean when he stated that he "needed to do something about the younger guys?"

2. Why was Putz inquiring about Cheek's fitness to do his job?

3. What other employees, if any, actually suffered wage reductions and/or hours cuts in 2004?

4. Was the stated reason of cost savings for Cheek's reduction in pay and subsequent termination a pretext for discrimination?

5. Was Cheek's age a motivating factor in his termination?

Lazzaro's Motion for Summary Judgment as to Cheek's age discrimination claim is, therefore, **DENIED**.

**B. Indiana Wrongful Discharge Claim**

Cheek also claims that he was wrongfully discharged under Indiana law in retaliation for the age discrimination complaints that he made in March 2004. Here, too, Cheek's claim survives summary judgment.

The parties agree that Indiana recognizes an exception to the employment at will doctrine where an employee is discharged for exercising a statutorily conferred right, *see Markley Enterprises, Inc. v. Grover*, 716 N.E.2d 559 (Ind. Ct. App. 1999), and that this exception is the lynchpin of Cheek's state law discrimination claim. (Def. Brief at 15-16; Plf. Resp. at 15).

The Indiana Supreme Court first recognized a state law action for retaliatory discharge in *Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (1973), a case that pertained to the filing of a worker's compensation claim. Since then, Indiana courts have recognized that wrongful discharge claims are not limited to retaliation for filing worker's compensation claims, but extend to any situation in which an employee is terminated after exercising a statutorily protected right. *Meyers v. Meyers*, 846 N.E.2d 280, 286 (Ind. Ct. App. 2006). To survive summary judgment in a retaliatory discharge case, the plaintiff must present evidence which directly or indirectly supports the inference of causation between the discrimination complaint and the termination. *Markley*, 716 N.E.2d at 565. Examples of indirect evidence include: 1) proximity in time between the two acts; or 2) an employer's proffered reason for the termination which is patently inconsistent with the evidence before the court. *Id*.

In this case, Lazzaro emphasizes that Cheek cannot present any direct evidence that he was discharged because he complained about age discrimination. In this respect, we agree with Lazzaro. Although Putz's age-based comments of April 20-21, 2004 may support a claim under the ADEA for age-based firing, they do not evidence, by themselves, any retaliation for Cheek's

12

earlier age discrimination claims. However, Cheek has presented indirect evidence of retaliation sufficient to raise questions of fact reserved for the jury.

Cheek has certainly presented evidence of suspicious timing. First, Cheek's hours were reduced on March 5, 2004. Cheek complained about the reduction and raises the specter of age discrimination in his letter dated March 7, 2004 which Lazzaro recognizes as an age discrimination claim and addresses in their March 9, 2004 meeting. Then, on March 22, 2004, Lazzaro hired Bill Watson, an individual who is significantly younger than Cheek, but who performs many of the same duties. A month later, Lazzaro reduced Cheek's wages by $5.00 per hour "in order to do something with the younger guys" – one of whom is Watson. When Cheek refuses to accept the reduction of wages, his employment is terminated. Thus, within six weeks of his initial age discrimination complaint, Cheek was presented with significant wage reductions, was terminated when he refused to consent to those reductions, and, in effect, was replaced by a younger individual.

Second, Lazzaro's proffered reasons for Cheek's termination are suspect. Lazzaro first argues that Cheek was only fired because he refused to accept wage and hour decreases. However, Cheek initially accepted the hours decrease (subject to his age discrimination complaint). It was only after his complaint and the subsequent wage reduction that Cheek again stated he would not accept both changes. Cheek's refusal to accept changes that might, themselves, have been in retaliation for his age discrimination claim cannot provide a nondiscriminatory reason for his firing. Moreover, while Lazzaro's financial condition may have provided a nondiscriminatory reason for Cheek's termination, that reason does little more than create a factual question that precludes summary judgment at this stage.

13

As the facts stand before the Court, Lazzaro terminated Cheek shortly after he complained about age discrimination (perceived or real) and all of Cheek's duties were absorbed by younger Lazzaro employees (including one who was not hired until after Cheek complained). Thus, we find the following questions of material fact:

1. What was Lazzaro's real motivation for reducing Cheek's hours in March 2004?
2. Did Lazzaro intend to replace Cheek with Bill Watson after Cheek made claims of age discrimination?
3. If not, why was Bill Watson hired?
4. What was Lazzaro's real motivation for reducing Cheek's wages in April 2004?

Lazzaro's Motion for Summary Judgment as to Cheek's wrongful discharge claim is, therefore, **DENIED**.

## C. Intentional Infliction of Emotional Distress

Although both Cheek's claims for age discrimination and wrongful discharge survive summary judgment, his claim for intentional infliction of emotional distress does not. Cheek presents no evidence of extreme or outrageous conduct on the part of Lazzaro and he has not shown that Lazzaro intended to inflict such emotional distress upon him. As such, his claim for intentional infliction of emotional distress must fail.

Under Indiana law, intentional infliction of emotional distress occurs when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Conwell v. Beatty*, 667 N.E.2d 768, 775-76 (Ind. Ct. App. 1996). The actions of the alleged tortfeasor must also be indecent, atrocious, and intolerable in order to qualify as conduct that would give rise to a claim for intentional infliction of emotional distress:

14

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Gable v. Curtis*, 673 N.E.2d 805, 809-10 (Ind. Ct. App. 1996) (quoting RESTATEMENT (SECOND) OF TORTS §46 cmt. d (1965)).

Cheek has not met his burden of proving that Lazzaro's conduct even approaches behavior so extreme as to constitute an intolerable atrocity. Nothing that Cheek has designated as evidence would lead an average member of the community to exclaim, "Outrageous!" His cut in hours and proposed cut in wages do not suffice. While Lazzaro's motivation for reducing those hours and wages may be suspect, nothing in the manner in which they went about making those changes is so extreme or outrageous to sustain a claim for intentional infliction of emotional distress. Indeed, Lazzaro wanted Cheek to stay on at the facility (albeit with reduced hours and wages) and seemed to express genuine regret (as opposed to abusive behavior) when Cheek would not agree to the new terms. In sum, while Cheek may have been served a raw deal at Lazzaro, he has not presented any evidence that Lazzaro's actions were extreme, outrageous, or intended to cause him emotional distress.

## IV.  CONCLUSION

For the foregoing reasons, the Lazzaro's Motion for Summary Judgment [Docket No. 21] is **GRANTED IN PART AND DENIED IN PART**. Defendant's Motion is **DENIED** as to

Cheek's ADEA and wrongful discharge claims. Lazzaro's Motion is **GRANTED** as to Cheek's claim for intentional infliction of emotional distress.   This case remains set for final pretrial conference on August 10, 2006.

    **SO ORDERED.**

    ENTERED: July 21, 2006

                                      s/ Philip P. Simon
                                      PHILIP P. SIMON, JUDGE
                                      UNITED STATES DISTRICT COURT